Raymond A. Hall v. Commissioner.
Hall v. Commissioner
Docket No. 18237.
United States Tax Court
1951 Tax Ct. Memo LEXIS 182; 10 T.C.M. (CCH) 599; T.C.M. (RIA) 51194; June 25, 1951
*182 Petitioner and Arthur A. Keil were principal stockholder-officers in a wholesale jewelry corporation, each owning 50 per cent. Keil became incapacitated and unable to continue in the business. Petitioner purchased Keil's 50 per cent of the capital stock of the company pursuant to an agreement dated November 25, 1944. Shortly following the purchase and upon acquisition of the stock, petitioner caused the corporation to be dissolved and its assets distributed in kind to him in exchange for the stock thus acquired. Petitioner's purchase of Keil's stock was the result of an arm's length transaction. Held: Petitioner realized a long-term capital gain based on the difference between the original cost of his 50 per cent of the stock and the fair market value of a 50 per cent interest in the corporate assets as established by the price paid for such stock. Held, further, the distribution of the assets of the corporation immediately following his acquisition of the Keil stock resulted in neither gain nor loss to taxpayer. Lloyd V. Weiser, Esq., for the petitioner. John D. Picco, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent *183 determined a deficiency in income tax for the calendar year 1944 in the amount of $2,260.35. In his amended answer respondent claimed an increase in the deficiency to $4,135.35, due to the realization by petitioner of additional unreported capital gain. Findings of Fact The stipulated facts are so found and made a part hereof. Additional facts are found from the oral evidence and exhibits. The petitioner, Raymond A. Hall, is now a resident of Richland, Washington. During the tax year in issue, and for many years prior thereto, he was a resident of Portland, Oregon. The Keil-Hall Company was a corporation organized in 1936 under the laws of the State of Oregon, with its principal place of business at Portland, Oregon, and at all times material to this proceeding, was engaged in a general wholesale jewelry business. Its capitalization consisted of 200 shares of common stock of a par value of $50 each; its incorporators and directors were Raymond A. Hall, Arthur A. Keil, and Harold Weiss; and its officers were Keil, president, Weiss, vice president, and Hall, secretary-treasurer. Hall and Keil were owners of an equal number of shares of the capital stock of the corporation and *184 Weiss owned only qualifying shares. On November 25, 1944, pursuant to a contract of even date, the petitioner purchased all of the stock owned by Keil in the corporation. The petitioner paid $22,500 for Keil's stock. The purchase contract provided for payment in installments, "* * * together with interest on the unpaid balance at the rate of five (5%) per cent per annum from March 10, 1945, until the full sum of both principal and interest has been paid." The sum of $15,000 was payable in four installments, the last of which became due on or before March 10, 1945. The balance of the purchase price, ($7,500), was payable in installments due at the close of four successive six-month periods specified in the contract. These installments were payable out of the earnings of each six-month period, with the proviso that any deficiency in the amount thereof could be carried over and paid out of the earnings of the next period. Interest payments on the unpaid balance were due and payable at the close of each such period. A remedy was provided for the protection of the vendor in the event of default. At the inception and during the formative period of the corporation a large part of *185 its income was derived from the sale of goods not owned by the corporation but sold on a commission basis. This was changed by 1940 and thereafter the income from the sale of merchandise which the corporation owned exceeded commissions received from the sale of merchandise not so owned. On January 1, 1942, the Keil-Hall Company went into the "solid gold" jewelry, diamond and ring business on its own account. At the same time it was arranged that Keil-Hall Company would represent the Croton Watch Company of New York, and this line was taken on a commission basis with control of the entire Pacific Coast and Alaska. This arrangement constitued the only commission line carried by the company after December 31, 1941. The total earnings therefrom during the years 1942 to 1944, inclusive, were as follows: 1942
1943
1944
$2,383.70
$5,341.10
$3,775.80 These commissions were paid to the company and were part of the corporate earnings. As a wholesaler in the jewelry business, the Keil-Hall Company distributed its merchandise to independent retail merchants through the medium of traveling salesmen. A jewelry salesman regards customers as his "following and clientele. *186 " Petitioner and Keil were experienced salesmen, well known in the trade, and had acquired a substantial and valuable "following and clientele" as jewelry salesmen. Upon his retirement, Keil was replaced by Harry Schofield, an experienced office employee of the Keil-Hall Company. Schofield was successful in taking over and holding the sales territory formerly covered by Keil. He immediately acquired part of Keil's old customers or "following" and picked up more of his "following" as he became acquainted in the territory. In addition, Schofield acquired new and additional customers as well. During the war years, the big problem facing all jewelry wholesalers was getting the merchandise. In 1944, as in the other war years, the retail jewelry business was booming and all the wholesalers, including the Keil-Hall Company, had an easy time selling their merchandise. Keil was incapacitated by illness for some time prior to his separation from the company, and was inactive in the affairs of the business during the latter part of 1944. Keil was a capable executive and a fine salesman, and the loss of his services was felt by the company. The receipts from sales for the year 1944 compare *187 favorably with the years prior thereto. The petitioner sought and obtained the exclusive right to use the corporate name of the Keil-Hall Company, together with Keil's covenant not to interfere with the company's right to participate under the quota and allotment system existent during the war years. The corporate name of the Keil-Hall Company was valuable primarily because of its relation to and association with the inflow of merchandise under the quota and allotment system. Petitioner sought the use of the corporate name in order to keep others from "picking that name up and in any way upsetting the workings [they] had with customers or factories." Paragraph 10 of the contract dated November 25, 1944, reads as follows: "The party of the first part gives and grants to the party of the second part the exclusive right to the use of the name 'KEIL-HALL COMPANY' for the conduct of the business herein contemplated until February 28, 1946, and the party of the first part will not in any manner whatsoever do any act or thing which will injure or interfere with the trade relationship of the party of the second part nor cause the same to be done, which would in any way interfere *188 with the factory quotas, allotments or in-flow of merchandise of said business." Paragraph 13 of the same contract reads as follows: "The party of the second part shall on or before March 1, 1945, notify the Jewelers' Board of Trade, factories and trade in general regarding the status of the Keil-Hall Company and the retirement of the party of the first part from the business." The quota and allotment system was voluntarily inaugurated by the jewelry manufacturers some time after the beginning of the war, because of the general scarcity of merchandise and to secure to each distributor-wholesaler at least a limited source of merchandise. The jewelry manufacturers were not obligated under law to set up quotas and allotments for the benefit of the distributor-wholesalers, but most of the manufacturers established quotas and allotments during the war years. A new firm seeking to enter the wholesale jewelry business in November of 1944 would have had difficulty in participating under the quota and allotment system. The system operated in favor of concerns which had been in business for some time and were already known to the manufacturers. The Keil-Hall Company entered the field *189 in 1936 and established itself in the trade before the war. During the war years it was a profitable going concern, with numerous contacts among the manufacturers. These contacts were made by the representatives of the company. When the quota and allotment system was inaugurated during the war years, the Keil-Hall Company became a participant thereunder. Through the efforts of its representatives it maintained at least a limited source of merchandise during the period of general scarcity. The Keil-Hall Company ordinarily valued its inventory at cost or market, whichever was lower. This practice was followed by petitioner in taking the inventory as of November 30, 1944. The inventory at this time consisted for the most part of diamonds, solid gold jewelry, rings, clocks, and silverware. Petitioner valued this inventory at the amount of $25,758.05 on the above date. In 1944, and at all times during the war, jewelry was scarce and some of it was inferior in quality to the post-war merchandise. Keil became too ill to continue in the business, and decided to sever his connection with the Keil-Hall Company in November of 1944. Petitioner was interested in acquiring Keil's stock and *190 negotiations were inaugurated to that end. Keil instructed Weiss to represent him in negotiations with petitioner for the sale of his stock in the Keil-Hall Company. Weiss was related to Keil. He was a vice president of the U.S.National Bank, Portland, Oregon, in charge of branch loans, which position required the examination of balance sheets and financial statements. He was also an officer of the Keil-Hall Company, acting in an advisory capacity only. He was instructed by Keil to make the "best deal possible." During the negotiations, petitioner wanted to pay book value only, and Weiss, who maintained that the business was worth more than book value, wanted a sum in excess of $22,500. Both of them considered such factors as the inventory, the balance sheet, the earning power of the business, the corporate name, the company's inflow of merchandise under the quota and allotment system, and Keil's covenant not to interfere with the then existing trade relationships and the inflow of merchandise. The differences were resolved in the ensuing negotiations, and petitioner agreed to purchase Keil's stock for a price of $22,500. The sale represented an ordinary business transaction and *191 the price fixed by the parties thereto was the result of arm's length bargaining. The State of Oregon issued a certificate of dissolution of the Keil-Hall Company on or about January 25, 1945. The Keil-Hall Company kept its books on an accrual basis. It reported its income on a calendar year basis. Its final return for the year 1944 covered the normal operations of the business from January 1 to November 30, 1944, the date of its dissolution. The book value of the physical assets of the Keil-Hall Company on November 30, 1944, was as follows: Assets
Cash
$ 6,098.74
Receivables
8,444.41
Inventory
25,758.05
Other Assets
3,561.62
$43,862.82
Liabilities
Payables
$14,248.71
Accrued Expenses
8,179.81
$22,428.52
Net Worth
Stock
$ 7,000.00
Paid-in Surplus
6,500.00
Earned Surplus
7,934.30
$21,434.30
The sales, gross profit, total income, expenses and net income of the Keil-Hall Company, for the years 1940 to 1944, inclusive, as complied from the corporate income tax returns for those years, were as follows: 1940
1941
1942
1943
1944
(11 months)
Sales
$55,047.08
$81,304.88
$134,643.57
$192,720.94
$173,041.63
Gross Profit
13,424.90
18,781.49
35,350.76
47,147.06
44,844.30
Total Income
21,869.51
26,824.65
40,858.01
56,068.64
51,300.22
Officers' Salaries
8,500.00
10,000.00
22,000.00
24,000.00
20,300.00
Other Expenses
13,857.31
16,512.61
15,656.24
17,890.18
19,190.09
Net Income
(487.80)
312.04
3,201.77
14,178.46
11,810.13
*192 Arthur A. Keil delivered his stock certificates to petitioner on or about November 30, 1944. On or about the same date the petitioner, who was then the sole owner of all the outstanding capital stock, dissolved the Keil-Hall Company, as was contemplated by the purchase contract dated November 25, 1944. The petitioner caused all of the assets of the corporate business to be distributed in kind to himself on or about December 1, 1944. The petitioner then continued and operated the business as a sole proprietorship or as a partnership under the name of Keil-Hall Company. At a subsequent date, on or about March 1, 1945, after consulting with and obtaining the advice and approval of the manufacturers, petitioner changed the name of the business to "Raymond A. Hall Company." The fair market value of the total assets on the date of liquidation of the Keil-Hall Company was $45,000. The fair market value of all of the stock of the company at the time of the sale was likewise $45,000. Opinion VAN FOSSAN, Judge: The first question posed on the above facts is whether the sale of Keil's stock to petitioner was an arm's length transaction. Petitioner contends that it was made under *193 such circumstances as to make it a forced sale. We cannot agree. On the contrary, we are convinced by the record that it was a voluntary sale in which the parties, both being well informed, each bargained for his own personal advantage. It was clearly an arm's length transaction and without compulsion. The sale being as just stated, it follows that it is the best evidence before us of the fair market value of the Keil stock at the time of acquisition by petitioner. By the same token, the distribution having occurred immediately after the sale, it is the best evidence of the fair market value of the assets as of the date of distribution. Petitioner after the sale, owned two blocks of stock - one, the 50 per cent interest originally owned by him, which had a cost to him of $6,750 and had a fair market value of $22,500 at the time of distribution of the assets, and, second, the 50 per cent interest acquired by petitioner from Keil, which cost petitioner $22,500 and had a basis of $22,500 at the date of distribution of the assets. Distribution of the assets represented by the stock originally owned by petitioner, therefore, resulted in a longterm capital gain based on the difference *194 between $22,500 and $6,760, or $15,750. Distribution of the assets represented by the stock acquired from Keil resulted in neither gain nor loss. Decision will be entered under Rule 50.